PAR: 2022R00694

**SEALED**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED ___ ENTERED
___ LOGGED ___ RECEIVED

MAY 19 2023

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. RDB 23cr187 |
| | * | |
| HAROLD DOTSON, | * | (Wire Fraud Conspiracy Affecting |
| | * | A Financial Institution, 18 U.S.C. § |
| Defendant. | * | 1349; Forfeiture, 18 U.S.C. |
| | * | § 981(a)(1)(C); 21 U.S.C. § 853(p); |
| | * | 28 U.S.C. § 2461(c)) |

**INFORMATION**

**COUNT ONE**
(Wire Fraud Conspiracy Affecting A Financial Institution)

**Relevant Individuals and Entities**

The United States Attorney for the District of Maryland charges that:

At all times material to the Information:

1. Defendant **HAROLD DOTSON ("DOTSON")** was a resident of Gaithersburg, Maryland and was the owner and principal of H&M Tax Service LLC ("H&M Tax") d/b/a H&M Financial Group, LLC, a tax preparation business. **DOTSON** prepared false and fraudulent Paycheck Protection Program ("PPP") loan applications and false and fraudulent supporting tax forms for various borrowers. **DOTSON** also prepared false and fraudulent Economic Injury Disaster Loan ("EIDL") applications for various borrowers.

2. Co-conspirator A.S. was a resident of Baltimore, Maryland who ran a purported financial services business.

3. Cross River Bank ("Cross River") was a federally insured financial institution headquartered in Fort Lee, New Jersey. Cross River was an approved United States Small Business Administration ("SBA") lender and participated as a lender in the PPP.

**The Paycheck Protection Program**

4.  The PPP was a coronavirus disease ("COVID-19") pandemic relief program administered by the SBA that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

5.  To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was required to provide documentation, such as filed federal income tax documents, showing its payroll expenses and substantiating that the borrowing business was in operation before or on February 15, 2020. The payroll expenses for the qualifying business served as the basis for the amount of its PPP loan.

6.  PPP loan applications were electronically submitted or caused to be submitted by the borrower and received through SBA servers located outside of the District of Maryland. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business or business owner.

7.  The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal

income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

### The Economic Injury Disaster Loan Program

8. The EIDL program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. Through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), the SBA was authorized to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

9. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000.00 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

10. In order to obtain an EIDL or an advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020. The applicant was required to also certify that all the information in the application was true and correct to the best of the applicant's knowledge. EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor. The amount of the loan, if the application was approved, was determined, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL or advance were issued directly by the SBA. EIDL funds were eligible to be used for working capital for fixed debts, payroll expenses, accounts payable, and other bills resulting from the pandemic.

3

If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

### The Conspiracy and the Scheme to Defraud

11. Beginning in or around April 2020 and continuing through in or around January 2022, in the District of Maryland and elsewhere, the defendant,

**HAROLD DOTSON,**

knowingly and willfully, conspired with A.S., and others known and unknown to the United States Attorney to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the SBA, Cross River, and other lenders and to obtain and attempt to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme to defraud, did knowingly and willfully transmit and cause to be transmitted by means of wire communications, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds (the "scheme to defraud"), in violation of 18 U.S.C. § 1343.

### The Object the Scheme to Defraud

12. It was the object of the conspiracy and scheme to defraud for **DOTSON** to personally enrich himself by (1) fraudulently obtaining and attempting to obtain EIDL and PPP loans and money for his own personal use and benefit, and for the personal benefit and use of his associates; and (2) fraudulently obtaining and attempting to obtain fees from owners of purported businesses for whom he helped obtain and EIDL and PPP loans, often in the amount of 5% to 15% of the PPP loans obtained.

### Manner and Means of the Scheme to Defraud

13. It was part of the conspiracy and scheme to defraud that **DOTSON**, A.S., and others known and unknown to the United States Attorney referred, and directed others to refer, business

owners to H&M Tax for the purpose of obtaining assistance in connection with obtaining EIDL and PPP loans.

14. It was a further part of the conspiracy and scheme to defraud that **DOTSON**, A.S., and others known and unknown to the United States Attorney, offered to assist the business owners in applying for EIDL and PPP loans in exchange for a fee.

15. It was a further part of the conspiracy and scheme to defraud that **DOTSON**, A.S., and others known and unknown to the United States Attorney, assisted in the preparation of fraudulent PPP loan applications for businesses by claiming grossly inflated numbers of employees and grossly inflated monthly payroll costs, including for businesses that did not exist in any legitimate capacity.

16. It was a further part of the conspiracy and scheme to defraud that **DOTSON** and others known and unknown to the United States Attorney, assisted in the preparation of fraudulent EIDL applications for businesses by claiming grossly inflated numbers of employees and grossly inflated revenue numbers, including for businesses that did not exist in any legitimate capacity.

17. It was a further part of the conspiracy and scheme to defraud that in support of the PPP applications, **DOTSON** prepared various false and fraudulent records, which were submitted with the PPP applications, including false United States Internal Revenue Service ("IRS") Forms 940 (Employer's Annual Federal Unemployment Tax Return), 941 (Employer's Quarterly Federal Tax Return), 944 (Employer's Annual Federal Tax Return), and W-3 (Transmittal of Wage and Tax Statements) for the businesses. The purpose of the false IRS and fraudulent Forms 940, 941, 944, and W-3 was to circumvent Cross River's requirement and the requirement of other SBA approved lenders that prospective borrowers submit documentation to support the payroll figures that served as the basis for the PPP loan amount. None of these false and fraudulent and IRS Forms 940, 941, 944, and W-3 that **DOTSON** prepared were ever filed with the IRS.

18. It was a further part of the conspiracy and scheme to defraud that **DOTSON** prepared these false and fraudulent and IRS Forms 940, 941, 944, and W-3 and included false information concerning, among other things, payroll costs and the number of employees in order to achieve a loan of the amount desired by the prospective borrower.

19. It was a further part of the conspiracy and scheme to defraud that **DOTSON** would frequently forge the signatures of prospective borrowers on the false and fraudulent IRS Forms 940, 941, 944, and W-3s submitted in connection with fraudulent PPP applications.

20. It was a further part of the conspiracy and scheme to defraud that **DOTSON**, A.S., and others known and unknown the United States Attorney communicated with one another and with prospective clients electronically by sending messages and documents about their efforts to obtain PPP loans.

21. It was a further part of the conspiracy and scheme to defraud that A.S., and others known and unknown the United States Attorney told the prospective borrowers that in order to complete the PPP loan applications, they would have to provide, among other things, a copy of their driver's license, biographical information, and banking information for their business.

22. It was a further part of the conspiracy and scheme to defraud that, after a PPP loan was funded, **DOTSON**, A.S., and others known and unknown the United States Attorney collected a fee of as much as a 30% of the PPP loan amount the borrower, which was then split among the conspirators.

23. It was a further part of the conspiracy and scheme to defraud that **DOTSON** used IP address 108.56.251.159, associated with his residence at the time, when applying for EIDL and PPP loans.

24. It was a further part of the conspiracy and scheme to defraud that when **DOTSON** and his co-conspirators applied for EIDL and PPP loans, they caused interstate wire communications, including from Maryland to other states.

25. It was a further part of the conspiracy and scheme to defraud that **DOTSON** and his co-conspirators transferred money via Zelle, ATM withdrawals, and other financial transactions that caused interstate wire communications, including from Maryland to other states.

26. It was a further part of the conspiracy and scheme to defraud that 85 PPP loan applications, including to Cross River, seeking more than $14,807,609.37 which had material false representations and included false and fraudulent IRS Forms 940, 941, 944, or W-3 prepared by **DOTSON**, were submitted in connection with the conspiracy and scheme to defraud. All of these loans were ultimately disbursed.

27. It was a further part of the conspiracy and scheme to defraud that 183 EIDL applications which had material false representations, were submitted by **DOTSON** in connection with the conspiracy and scheme to defraud. Of these loans, 50 loans reflecting $3,954,100 in EIDL funds were ultimately funded.

18 U.S.C. § 1349

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland further alleges that:

1. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction under the offense in Count One of this Information.

### Wire Fraud Forfeiture

2. Upon conviction of the offense in Count One of this Information, the defendant,

**HAROLD DOTSON**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

3. The property to be forfeited includes, but is not limited to, a money judgment in the amount of at least $828,498.95.

### Substitute Assets

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

May 18, 2023

Date

Erek L. Barron
United States Attorney