FILED ___ ENTERED
___ LOGGED _____ RECEIVED

4:11 pm, Jul 27 2023
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

---

*Paul A. Riley*
*Assistant United States Attorney*
*Paul.Riley@usdoj.gov*

*Mailing Address:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*Office Location:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*DIRECT: 410-209-4959*
*MAIN: 410-209-4800*

May 10, 2023

Adam Harris, Esq.
Law Office of Adam D. Harris, L.L.C.
600 Jefferson Plaza, Suite 201
Rockville, MD 20852

    Re:    <u>United States v. Harold Dotson</u>, Crim. No:

Dear Counsel:

    This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Harold Dotson (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by May 17, 2023, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense of Conviction</u>

    1.    The Defendant agrees to plead guilty to Count One of the Information, which charges the Defendant with Conspiracy to Commit Wire Fraud Affecting Financial Institutions, in violation of 18 U.S.C. §§ 1349, 1343. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

<u>Elements of the Offense (Wire Fraud Conspiracy Affecting a Financial Institution)</u>

    2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Information, in the District of Maryland,

    a.    Two or more persons agreed to try to accomplish a common and unlawful plan to commit a fraud crime listed in Title 18 Chapter 63, as charged in the Indictment—that is:

    b.    transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing a scheme or artifice to defraud,

    c.    having devised or intended to devise the scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

d.  affecting a federally insured financial institution; and

e.  the Defendant knew the unlawful purpose of the plan and willfully joined it.

Penalties

3.  The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. §§ 1349, 1343 | N/A | 30 years | 5 years | $1,000,000 or twice the gain or loss from the offense | $100 |

a.  Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.  Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.  Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.  Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e.  Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.  Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant

agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. The Defendant has the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an indictment against him. By agreeing to proceed by way of Information, he is giving up that right, and understands that the charges will be filed by the United States Attorney without the Grand Jury.

    b. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    c. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    d. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    e. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    f. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    g. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant

may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        h.     If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        i.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.     This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

### Count One

        a.     This Office and the Defendant agree that the offense of conviction and relevant conduct described in Attachment A group pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3D1.2.

        b.     This Office and the Defendant further agree that the applicable base offense level is **7 (seven)** pursuant to United States Sentencing Guidelines ("USSG") §§ 2X1.1(a) and 2B1.1(a)(1).

Rev. August 2018

    c.  This Office and the Defendant further agree that there is a **20 (twenty)** level increase pursuant to USSG §2B1.1(b)(1)(K) because the loss amount was more than $9,500,000 but less than $25,000,000 (subtotal: 27).

    d.  This Office and the Defendant further agree that there is a **2 (two)** level increase pursuant to U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means (subtotal: 29).

    e.  This Office and the Defendant further agree that there is a **2 (two)** level increase pursuant to U.S.S.G. § 3B1.3 because the Defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense (subtotal: 31).

    f.  This Office does not oppose a 2 (two) level reduction in the Defendant's adjusted offense level pursuant to USSG §3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to USSG §3E1.1(b) for an additional one level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under USSG §3E1.1(a) and may decline to make a motion pursuant to USSG §3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

    g.  Thus, the final anticipated adjusted offense level **28**.

  7.  There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

  8.  Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

  9.  At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background,

character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Information. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

### Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

      i. The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

      ii. This Office reserves the right to appeal any sentence below a statutory minimum.

   c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: a money judgment in the amount of at least $828,498.95 in U.S. currency.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture. The defendant agrees that, due to his acts or omissions, the total proceeds he obtained as a result of the scheme to defraud are not currently available of the Government for forfeiture, and that the Government is entitled to the forfeiture of substitute assets because one or more of the conditions in 21 U.S.C. § 853(p) have been met.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Collection of Financial Obligations

16. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. If restitution is not paid by the date of sentencing, in order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. If restitution is not paid by the date of sentencing, the Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that any financial statement and disclosures the Defendant submits will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C.§ 1001 by an additional five years' incarceration and fine.

### Defendant's Conduct Prior to Sentencing and Breach

17. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will

cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Restitution

19. The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation, which the parties stipulate is at least $24,807,432.49. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Court Not a Party

20. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up

to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

21. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

Paul A. Riley
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

5/17/2023
Date

Harold Dotson

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

5/17/23
Date

Adam Harris, Esq.
Counsel to Defendant

Rev. August 2018

9

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that the following facts are true and accurate and if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Defendant Harold Dotson, born 1971, is a resident of Gaithersburg, Maryland. Beginning in April 2020 and continuing through January 2022 in the District of Maryland, Defendant and his co-conspirator Ahmed Sary ("Sary") conspired together and engaged in a scheme to defraud a financial institution, Cross River Bank, and the United States Small Business Administration (SBA), and other SBA-approved lenders to obtain numerous fraudulent Protection Program (PPP) loans and Economic Injury Disaster Loans (EIDLs).

For the purpose of executing and attempting to execute this scheme to defraud, Defendant and his co-conspirator Sary knowingly and willfully transmitted and caused to be transmitted by means of wire communications, in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. §§ 1349, 1343.

Defendant was an accountant and tax preparer and was the owner and principal of H&M Tax Service LLC ("H&M Tax") d/b/a H&M Financial Group, LLC, a tax preparation business during the time frame of the conspiracy. Defendant used his expertise as an accountant and tax preparer to assist in the preparation of false and fraudulent EIDL and PPP loan applications for purported businesses that did not exist in any legitimate capacity and that included false information concerning, among other things, number of employees, monthly payroll costs, and revenue. Defendant also used his expertise as an accountant and tax preparer to routinely create false and fraudulent United States Internal Revenue Service ("IRS") tax forms that he submitted with fraudulent PPP applications and that he provided to Sary and other co-conspirators to be submitted with fraudulent PPP applications.

Defendant frequently forged the signatures of the owners of the purported businesses on the false and fraudulent IRS forms. These forms were submitted by Defendant and his co-conspirators with the PPP applications to substantiate the false representations made in the applications.

Defendant received a fee in exchange for his assistance in connection with the submission of fraudulent PPP and EIDL applications, ultimately receiving at least $828,498.95 from co-conspirators as a result of the scheme to defraud charged in Count One of the Information.

Defendant primarily used the fraudulently obtained funds to gamble—spending the funds at various casinos in Maryland including Maryland Live, the Horseshoe, and MGM National Harbor, as well as on a gambling trip to Las Vegas.

Defendant's conspiracy with Sary resulted in the disbursement of more than $14,807,609.37 in fraudulently obtained PPP funds in connection with more than 85 fraudulent PPP loans.

Likewise, Defendant's conspiracy with another co-conspirator, Erica Brown, resulted in the funding of at least 30 fraudulent PPP loans and the disbursement of at least $6,499,823.12.

Further, over $3,500,000.00 in EIDL funds were funded and disbursed as a result of fraudulent EIDL applications submitted by Defendant. Finally, Defendant submitted 133 fraudulent EIDL applications in connection with the scheme; however, these 133 loans ultimately did not close.

Defendant's crimes are discussed in further detail below.

### Fraudulent Applications For Businesses Associated With Defendant

As an initial matter, in connection with the conspiracy and scheme to defraud, Defendant submitted multiple false and fraudulent EIDL and PPP loan application in connection with various businesses for which he owned or otherwise had an interest, resulting in multiple interstate wires from Maryland to Virginia—the location of the SBA's servers.

On or about April 3, 2020, Defendant submitted an EIDL application for a purported business called R&D Investment Capital LLC. He was listed as one of the business's owners. The application contained multiple material misrepresentations concerning the business's gross revenues and operating expenses. As a result of the representations in the application, $28,400 in fraudulent funds were disbursed to a bank account controlled by one of Defendant's associates.

On or about May 1, 2020, Defendant submitted a PPP loan application for a purported business called A&B Maintenance and Cleaning Services LLC, with a business address of 18 Goodport Lane in Gaithersburg, Maryland (Defendant's home at the time), to Mid-Atlantic Federal Credit Union. That application contained multiple material misrepresentations concerning the business, including its gross receipts and average monthly payroll cost. As a result of the misrepresentations in the PPP application, $24,928.32 in fraudulent funds were disbursed to a bank account controlled by a close relative of Defendant.

On or about May 6, 2020, a PPP loan application for a purported business called R&D Investment Group, with a business address of 18 Goodport Lane in Gaithersburg, Maryland, was submitted to the Harbor Bank of Maryland. That application also contained material misrepresentations concerning the business, including its gross receipts. As a result of the representations in the PPP application, $20,800 in fraudulent funds were disbursed to a bank account controlled by one of Defendant's associates.

On or about July 31, 2020, Defendant submitted an EIDL application for a purported business called Sharpshooters Boxing & Fitness LLC, a business which Defendant formed, but which was not operational. The application contained multiple material misrepresentations concerning among other things, the business, gross revenues, and number of employees; it falsely claimed that the business had 6 employees and gross revenues of $179,642.00. In fact, it had no employees and no revenues. As a result of the misrepresentations in the application, $89,900 in fraudulent funds were disbursed to a bank account opened and controlled by Defendant.

On or about March 1, 2021, a second round PPP loan application for A&B Maintenance and Cleaning Services LLC was submitted to Mid-Atlantic Federal Credit Union. That application also contained material misrepresentations concerning the business, including its gross receipts and average monthly payroll cost. As a result of the misrepresentations in the second round PPP application, $20,832.50 in fraudulent funds were disbursed to a bank account controlled by the Defendant's wife, Marcia Dotson.

Rev. August 2018

### Conspiracy With Ahmed Sary – Submission Of Fraudulent PPP Loan Applications With Fabricated IRS Forms Prepared By Defendant

In addition to obtaining fraudulent PPP and EIDL funds for purported businesses associated himself and his associates, Defendant routinely assisted co-conspirator Sary with obtaining fraudulent PPP loans from Cross River Bank and other SBA-approved lenders for various purported businesses that did not exist in any legitimate capacity in exchange for a fee. Sary received a fee (sometimes as much as 30% of the fraudulent PPP loan amount) in exchange for his services and provide a portion of those fees to Defendant—approximately 2% to 7% of the PPP loan amount.

These applications grossly inflated the numbers of employees and grossly inflated monthly payroll costs of the purported businesses. Further, Defendant prepared various false and fraudulent records to support the payroll figures included in the fraudulent PPP applications, including false United States Internal Revenue Service ("IRS") Forms 940 (Employer's Annual Federal Unemployment Tax Return, 941 (Employer's Quarterly Federal Tax Return), and 944 (Employer's Annual Federal Tax Return) for the purported businesses. These forms created by Defendant also contained purported signatures of the business owners that were forged by Defendant.

The purpose of the false IRS and fraudulent Forms 940, 941, and 944 was to circumvent Cross River Bank's requirement and the requirement of other SBA-approved lenders that prospective borrowers submit documentation to support the payroll figures that served as the basis for the PPP loan amount.

Beginning in June 2020 and continuing through January 2022, Defendant received at least $198,520 in funds from entities associated with Sary, as well as Sary's wife Izabela Sary, which constituted payments to Defendant for his assistance in connection with the submission of fraudulent PPP loans for businesses associated with Sary, his wife, and various other individuals.

Some of these PPP loan applications were submitted by Sary. Some were submitted by Defendant using information provided to him by Sary, including the purported business owner's name and identifiers, identifiers associated with the purported business and typically a photograph or photocopy of the business owner's driver's license.

*Purported Businesses Associated With Sary*

For example, Defendant prepared fabricated IRS Forms for various purported businesses owned or operated by Sary that did not exist in any legitimate capacity, including a purported financial services business (AMEX Financial Group), a purported meatpacking business (Am Halal Meat), a purported pizza business (AMT Pizza), and a purported talent agency (Sary Stars). These IRS forms contained multiple material misrepresentations including the number of employees of each purported business and the wages paid; these fabricated IRS forms were submitted in support of the PPP loan applications.

The IRS has no record of these IRS forms being filed with it for tax years 2019 or 2020.

Based on the false representations and fraudulent submissions made in the PPP applications and the fabricated IRS documents prepared by Defendant, Sary's purported businesses received PPP loans in the following amounts as set forth below:

| Entity | SBA Loan Type | Loan Amount | Funded Date |
|--------|---------------|-------------|-------------|

| | | | |
|---|---|---|---|
| Am Halal Meat Inc | PPP | $119,311.00 | 06/18/2020 |
| Am Halal Meat Inc | PPP | $119,310.00 | 2/20/2021 |
| AMT Pizza Inc | PPP | $139,938.00 | 6/30/2020 |
| Sary Stars Inc | PPP | $102,000.00 | 5/26/2020 |
| Sary Stars Inc | PPP | $102,000.00 | 2/23/2021 |
| **Total** | | **$582,559** | |

In exchange for his work in connection with the submission of these fraudulent PPP applications for Sary's purported businesses, Sary provided Defendant over $39,500.

*Other Purported Businesses*

Defendant also received payments from Sary in connection with the submission of fraudulent PPP loans for numerous other purported businesses, which were not directly associated with Sary but that Sary referred to Defendant for assistance.

*Expo Motor Group*

For instance, on or about July 16, 2020, Sary provided Defendant $27,000 in exchange for Defendant's preparation of a fabricated 2019 IRS Form W3 for an entity called Expo Motor Group, which contained multiple material misrepresentations, including that the entity paid $2,674,996.22 in wages.

The fabricated tax form was submitted with a PPP application to Cross River Bank which also contained material misrepresentations concerning, among other things, wages paid and number of employees.

Defendant himself submitted the PPP loan application from his home, resulting in an interstate wire from Maryland to Pennsylvania, the location of Cross River Bank's servers. Subscriber information for the internet protocol ("IP") address linked to the application came back to Defendant's prior residence at 18 Goodport Lane in Gaithersburg, Maryland.

On or about June 30, 2020, $557,290 in fraudulently-obtained funds flowed into a Truist account associated with Expo Motor Group LLC. The $27,000 Sary provided Defendant amounted to approximately 5% of the PPP loan amount.

*Prestige Executive Transportation*

Likewise, on or about July 3, 2020, Sary provided Defendant $17,000 in exchange for Defendant's preparation of a fabricated 2019 IRS Form 944 for an entity called Prestige Executive Transportation ("Prestige"), which contained multiple material misrepresentations, including that the entity paid $ 1,397,237.78 in wages.

The fabricated tax form was submitted with a PPP application to Celtic Bank which also contained material misrepresentations concerning, among other things, its wages paid and number of employees.

Defendant submitted the PPP loan application from his home in Maryland—affecting an interstate wire—and subscriber information for the IP address linked to the application came back to Defendant's residence.

On or about June 14, 2020, $291,090.00 in fraudulently-obtained funds flowed into a Wells Fargo account associated with Prestige. The $17,000 Sary provided Defendant amounted to approximately 5.8% of the PPP loan amount.

*DFW Trucking*

Additionally, on or about June 30, 2020, Sary provided Defendant $8,000 in exchange for Defendant's preparation of a fabricated 2019 IRS Form 944 for an entity called DFW Trucking LLC ("DFW"), which contained multiple material misrepresentations, including that the entity paid $689,460.22 in wages.

The fabricated tax form was submitted with a PPP application to Celtic Bank which also contained material misrepresentations concerning, among other things, its wages paid and number of employees.

Defendant submitted the PPP loan application from his home—once again affecting an interstate wire—and subscriber information for the IP address linked to the application came back to Defendant's residence.

On or about June 16, 2020, $143,637.00 in fraudulently-obtained funds flowed into a Wells Fargo account associated with DFW. The $8,000 Sary provided Defendant amounted to approximately 5.5% of the PPP loan amount.

Defendant also submitted PPP applications that contained false and fraudulent information about the purported businesses made up by the Defendant and that included fabricated IRS tax forms he created for other entities referred to him by Sary, including Dixon Travel LLC ($56,737 PPP loan), Exclusive Menswear, Inc. ($70,325 first draw PPP loan and ($70,326 second draw PPP loan), Mazin Limousine LLC ($66,622 first draw PPP loan and $66,620 second draw PPP loan), Royal Consulting Services Inc. ($155,010 PPP loan), Skyline Global LLC ($126,562 PPP loan), and Circle E Oil and Chemicals LLC ($459,325 PPP loan).

In total, Defendant's conspiracy with Sary resulted in the disbursement of $14,807,609.37 of fraudulently obtained funds in connection with more than 85 fraudulent PPP loans.

### **Conspiracy With Erica Brown – Submission Of Fraudulent PPP Loan Applications With Fabricated IRS Forms Prepared By Defendant**

In addition to the conspiracy and scheme to defraud with Sary, Defendant also prepared numerous fabricated IRS forms and assisted with the submission of at least 30 PPP loan applications containing multiple material misrepresentations for purported businesses that were referred to him by another co-conspirator: Erica Brown.

Beginning in May 2020 and continuing into late 2021, Defendant received at least $117,920 in funds from a purported business associated with Brown and her associates—AMB Sales, LLC (a purported auto sales business owned by Brown's son)—which constituted payments to Defendant for his assistance in connection with the submission fraudulent PPP loan applications for various purported businesses. At times, Defendant directed that these referral fees be deposited into a Wells Fargo bank account in his wife's name in order to conceal his receipt of the fraudulently obtained funds.

These applications prepared by Defendant inflated the numbers of employees and monthly payroll costs of the purported businesses using information made up by Defendant based on the amount of the desired PPP loan, which was provided to Defendant by Brown. Brown would also

provide to Defendant various pieces of information, including the purported business owner's name and identifiers, identifiers associated with the purported business and typically a photograph or photocopy of the owner's driver's license.

For example, on June 13, 2020, Brown, using the email address ericamo986@icloud.com, emailed Defendant various documents for use in connection with a PPP loan application for a purported business called St. Mary's Motorcars Inc. After preparing fabricated 2019 IRS Forms 941, 940 and 944 for the purported business, Defendant submitted the PPP loan application to Bank of America and on or about June 22, 2020, and $165,560 in fraudulent PPP loans was disbursed. Law enforcement seized a file pertaining to this fraudulent PPP loan during the execution of a search warrant at Defendant's residence on July 12, 2022.

Beginning June 23, 2020 and continuing through June 29, 2020, Brown (through AMB Sales LLC) sent Defendant a total of $25,000, with $20,000 being sent to the Wells Fargo account in his wife's name in exchange for Defendant's assistance with the preparation of the fraudulent PPP loan.

Likewise, on January 20, 2021, Brown, using the email address ericamo932@yahoo.com, emailed Defendant various documents for use in connection with a PPP loan application for a purported business called Bond and Butler Group LLC. Defendant prepared a fabricated 2019 IRS Form 940 for the purported business, and the PPP loan application to Cross River Bank was submitted. On or about March 20, 2021, $595,820 in fraudulent PPP loan funds were disbursed. Defendant received cash payments from Brown and her associates as payment for his work in connection with the loan. Law enforcement seized a file pertaining to this fraudulent PPP loan during the execution of a search warrant at Defendant's residence on July 12, 2022.

In total, Defendant's conspiracy with Brown resulted in the funding of at least 30 fraudulent PPP loans and the disbursement of at least $6,499,823.12.

### Additional Fraudulent EIDL Applications

Beginning in April 2020 and continuing through October 2020, Defendant submitted 183 fraudulent EIDL loan applications for various purported businesses, including purported businesses referred to him by Brown. In exchange for his assistance with the submission of the fraudulent EIDL applications, Brown would pay Defendant 10% to 15% of the loan amount. Defendant also routinely submitted fraudulent EIDL loan applications for individuals not referred to him by Brown and others—collecting approximately 10% to 27% of the loan amount as his fee for the preparation and submission of the applications.

All 183 of these EIDL applications were submitted using the same IP address, which was subscribed to Defendant at his prior address of 18 Goodport Lane in Gaithersburg, Maryland.

Defendant was responsible for filling out the information in the fraudulent EIDL applications, and included materially false information in the applications, including about each purported business's existence and each's gross revenues. Defendant determined the information to be included in each EIDL application according to the size of the loan sought.

Ultimately, of the 183 fraudulent applications Defendant submitted, 50 closed, and over $3,500,000.00 in EIDL funds were funded and disbursed.

### Federal Search Warrant

On July 12, 2022, law enforcement executed a federal search warrant at Defendant's home located at 7902 Coriander Drive, Unit 303 in Gaithersburg, Maryland. Law enforcement seized multiple electronic devices and numerous hard copy paper files from the residence, including files pertaining to various fraudulent PPP and EIDL loans submitted by Defendant or his co-conspirators and that frequently contained fabricated IRS Forms prepared by Defendant and, at time, hard copies of email correspondence with co-conspirators, including Sary and Brown, concerning the fraudulent PPP or EIDL loans.

Defendant executed the various fraud schemes discussed herein, in part, through the use of mobile phones, computers, the internet, multiple email accounts, and bank deposits and transfers, all of which involved interstate wires, and Defendant, Sary, and Brown were in Maryland when they transmitted wires to execute the scheme.

SO STIPULATED:

_____
Paul A. Riley
Assistant United States Attorney

5/18/2023
Date

_____
Harold Dotson
Defendant

5/18/23
Date

_____
Adam Harris, Esq.
Counsel to Defendant

Rev. August 2018

16